IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 19 C 892 |
| DEAN R. HILL, | ) ) | Judge Joan H. Lefkow |
| Defendant. | ) ) | |

## OPINION AND ORDER

Plaintiff Zurich American Insurance Company (Zurich) brought an action against Defendant Dean R. Hill, a former Zurich employee, seeking damages and injunctive relief for breaches of employment-related agreements and a settlement agreement. (Dkt. 1.)[1] This court previously entered partial summary judgment in favor of Hill, limiting the damages claims to breaches that occurred on or after October 11, 2018. (Dkt. 71.) The matter proceeded to a bench trial on damages (dkt. 77) because Hill stipulated to his liability (dkt. 76). Under Federal Rule of Civil Procedure 52(a), the court enters the following findings of fact and conclusions of law. Based on the stipulated facts and evidence presented at trial, Zurich is awarded judgment in the amount of $194,700.88.

## FINDINGS OF FACT

The parties stipulated to facts concerning Hill's liability for violating non-solicitation clauses contained in employment-related agreements and a settlement agreement (dkt. 76). The

---

[1] This court has jurisdiction over this action under 28 U.S.C. § 1332 and venue lies under 28 U.S.C. § 1391(b).

stipulations were admitted into evidence at trial without objection. At trial, Zurich also submitted several exhibits, which were admitted into evidence without objection, and presented Paul Stewart, a Zurich employee, as a witness. Hill presented no evidence.[2] Based on the evidence presented, the court makes the following findings.

I.    **Hill's liability based on stipulated facts**

In March 2011, Hill began working for Zurich as an insurance salesman. (Dkt. 76 at 1.) Hill's employment was governed by an employment agreement. (*Id*.) That agreement contained certain post-termination restrictive covenants. (*Id*.) Under sections 1(a)(i)-(iii) of the agreement, Hill agreed that, for one year following his termination, he would not directly, indirectly, or through any person or entity,

- solicit or accept any business similar to Zurich's Business from any person or entity who or which was or is a customer of Zurich, irrespective of where in the world said person or entity is located at the time such business is solicited or accepted, and with whom or which Hill had or has had 'Material Contact' on behalf of Zurich within the one-year period immediately preceding the termination of Hill's employment with Zurich (a 'Serviced Customer');

- solicit or accept any business similar to Zurich's Business from any person or entity who or which was or is a prospective customer of Zurich, irrespective of where in the world said person or entity is located at the time such business is solicited or accepted, and with whom or which Hill had or has had Material Contact on behalf of Zurich within the one-year period immediately preceding the termination of Hill's employment with Zurich (a 'Marketed Prospective Customer'); or

- divert or attempt to divert any Service Customer or Marketed Prospective Customer to any person or entity competitive with Zurich.

(*Id*. at 1-2.) Any breach of these provisions, according to the agreement, included the right to pursue injunctive relief and damages, along with attorneys' fees. (*Id*. at 2.)

---

[2] After trial, Hill, on his own behalf, sent an email to the court with his "rebuttal." The court disregards the email and its unsworn statements. (Dkt. 79.)

Hill's employment with Zurich terminated on February 14, 2018. (*Id*.) The day before, Hill and Zurich entered into a "General Release and Agreement" (release). (*Id*.) Under section 15 of the release, all terms in the employment agreement "remain[ed] in effect." (*Id*.) As consideration for signing the release, Zurich paid Hill $22,000. (*Id*.)

Hill then joined Oakland Insurance Agency (Oakland), one of Zurich's competitors. (*Id*. at 3.) Almost immediately, and in violation of the employment agreement and release, Hill solicited business from Zurich's customers. (*Id*.)

In July 2018, Zurich sent Hill a letter demanding he stop contacting Zurich's customers. (*Id*. at 4.) Hill responded, through his attorney Suzanne Bartos, that he "fully understands his obligations and has not and will not contact his old clients." (*Id*.)

Yet Hill continued to solicit Zurich's customers, and in September 2018 Zurich sent Hill a second demand letter. (*Id*.) By November 2018, Hill and Zurich entered into a settlement agreement, in which the non-solicitation provisions of the employment agreement were "reiterated" but the non-solicitation term was reduced by one month, to January 16, 2019. (*Id*.)

According to Hill, Bartos had advised him that calling someone and gathering the information required to prepare an insurance quote was not solicitation and did not violate the settlement agreement. (*Id*. at 7.) Relying on this advice, but in violation of the non-solicitation provisions, Hill continued to solicit Zurich's customers. (*Id*. at 5, 7.)

In January 2019, Hill contacted Zurich's customer Joe Lunghamer, who owned Joe Lunghamer Chevrolet and Joe Lunghamer Buick GMC. (*Id*. at 5.) In 2018, Lunghamer had purchased the following three policies from Zurich, covering the period from February 1, 2018, to February 1, 2019:

- a package policy for property, crime, auto liability, auto physical damage, and auto no fault coverage, with an annual premium of $218,941;

3

- a commercial umbrella liability policy, with an annual premium of $19,700; and

- an employment practices and third party discrimination liability (EPL) policy, with an annual premium of $6,844.

(*Id.* at 6.) Based on Hill's solicitation, Lunghamer did not renew his policies with Zurich and instead went with Oakland. (*Id.*)

## II.    Zurich's lost profits from Hill's breach based on the trial evidence

Hill started at Zurich in 2011 as an account executive. He was responsible for finding new customers and maintaining relationships with existing ones, including handling policy renewals and any insurance needs that arose. Hill handled Lunghamer's account, a long-time customer since at least 2008. In 2018, Lunghamer carried a package policy, a commercial umbrella liability policy, and an EPL policy, covering a 12-month period from February 1, 2018, to February 1, 2019. The 2018 annual premium for Lunghamer's three policies was $245,485. Hill received a 2.5% commission off the premium, totaling $6,137.

Zurich calculated its profit projection by subtracting losses and costs from the premium. As the insurer, Zurich paid claims based on its policy's coverage. These claim payouts were reflected in a "loss run report," which showed the net losses going back to 2014. Net loss was determined by taking the gross loss, which was the total amount paid out on any claims, and subtracting any paid or recovered money through other sources, such as deductibles or subrogation. When quoting the next year's premium, Zurich typically looked at its prior losses for that customer going back three to five years depending on the risk; the more losses, the further back Zurich would look. For Lunghamer, going back three years, (excluding 2015 and 2016 during which time Lunghamer did not carry a Zurich package policy) Zurich sustained net losses of $25,511 in 2014, $24,742 in 2017, and $32,512 in 2018.

To determine its projected 2019 net profit, Zurich began with its $206,836 net profit from 2018. Zurich reached this figure by subtracting Hill's $6,137 commission and the $32,512 net loss figure from the $245,485 annual premium. Zurich used the highest net loss figure from the last three years to give Hill the benefit of the doubt.

Although Lunghamer did not renew its policies with Zurich in 2019, Zurich still received some business from Lunghamer that year as a third-party administrator of a General Motors Financial auto physical damage policy. In this arrangement, General Motors Financial assumed all risk under the policy but captured all profits for claims below $2.5 million; anything above $2.5 million was covered by Zurich. The premium for that policy was $77,250 and Zurich received $12,135.12 from it as a third-party administrator. Thus, subtracting its net profit on the General Motors Financial policy from its projected 2019 net profit, Zurich would have netted $194,700.88 in profit.

According to Stewart, a Zurich area sales manager and Hill's former supervisor, customer renewal was not solely based on cost. Many customers stayed with Zurich based on the relationship. He also stated that the 2020 customer retention rate was 91.3% and it usually fell somewhere between 87% to 94%. Stewart was aware of no specific reason why Lunghamer would not have renewed his policies with Zurich after the 2018 policy period.

## LEGAL STANDARD

Hill's employment agreement, release, and settlement agreement with Zurich specified that Illinois law governed. To establish a breach of contract under Illinois law, a plaintiff must prove (1) a valid and enforceable contract exists; (2) he substantially performed; (3) the defendant committed a breach; and (4) resulting damages. *Rocha* v. *FedEx Corp.*, 164 N.E.3d

640, 670 (Ill. App. Ct. 2020). There is no dispute that these elements are met, and the only question is the amount of resulting damages.

A damages award for a breach of contract should place the nonbreaching party in the position it would have been in had the contract been performed. *See Sterling Freight Lines, Inc.* v. *Prairie Material Sales, Inc.*, 674 N.E.2d 948, 950 (Ill. App. Ct. 1996). Lost profits are recoverable, so long as the evidence affords a reasonable basis for computing damages and plaintiff establishes, with a reasonable of degree of certainty, that defendant's breach caused those damages. *Belleville Toyota, Inc.* v. *Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 199 (Ill. 2002).

The calculation of damages for lost profit is based on net profit. *See Sterling Freight Lines, Inc.*, 674 N.E.2d at 951. Net lost profit is the gross revenue based on contract price (here, the premium) less any expenses necessary for plaintiff's performance of the contract. *F. E. Holmes & Son Const. Co.* v. *Gualdoni Elec. Serv., Inc.*, 435 N.E.2d 724, 728 (Ill. App. Ct. 1982). Depending on context, a plaintiff's expenses can include direct costs (*e.g.*, labor, materials) and indirect costs (*e.g.*, overhead expenses). *Id.* Direct costs, and any portion of indirect costs that can be avoided by defendant's breach, or "variable indirect costs," are subtracted from the gross revenue. *Id.* But any portion of indirect costs that cannot be reduced by defendant's breach, or "fixed indirect costs," are not subtracted, *id.*, because they cannot be reduced by defendant's breach; plaintiff already incurred and paid them, *see Sterling Freight Lines*, 674 N.E.2d at 953.

## CONCLUSIONS OF LAW

At trial, Zurich asserted that its projected net lost profits on Lunghamer's business for 2019, $194,700.88, was not in dispute and no evidence undermined that figure. Zurich further argued that it was entitled to three years of lost profit. In support, it cited its high customer

retention rate, the stipulated fact that Hill's improper solicitation caused Lunghamer to leave Zurich, and the 12-year relationship between Zurich and Lunghamer. Accordingly, Zurich concluded, it was "reasonable" to award three years of net lost profit, which came to $584,102.64.

Hill argued, for his part, that the evidence suggested that Zurich would likely have offered Lunghamer a lower 2019 premium if it had known Lunghamer was shopping around, and Zurich's request for two additional years of lost profits was based on speculation. Hill also argued that Zurich's profit calculation was flawed because Illinois law required that net lost profit calculations deduct overhead expenses. Thus, Hill contended the court should limit the award to nominal damages because it cannot speculate about overhead expenses.

The court concludes that Zurich presented a reasonable basis for computing its damages and established with a reasonable degree of certainty the net lost profits for 2019 that were traceable to Hill's breach. To determine its 2019 net lost profits, Zurich used a simple formula. It started with the 2018 premium and losses from claims. The 2018 net loss figure happened to be the highest number from the last three years that Lunghamer had package, umbrella, and EPL policies with Zurich, which is the time period it would typically consider when quoting the next year's premium. Zurich then subtracted the account executive's commission and, unique to 2019, profit that it received as a third-party administrator of another policy. Zurich therefore established that it reasonably could have expected to net $194,700.88 in profit but for Hill's breach.

But Zurich's claim that Lunghamer would have continued with Zurich for another two years but for Hill's improper solicitation is speculative. Although Lunghamer had been a Zurich customer since at least 2008, its policy coverage had not been consistent in recent years, with

Lunghamer's dropping some of its Zurich policies for 2015 and 2016 before returning in 2017. And, according to Stewart's testimony, account executives like Hill were the ones who maintained customer relationships, suggesting that Hill was the reason that Lunghamer was content with its insurance needs at Zurich, as opposed to the policy options or prices from Zurich. This was bolstered by the fact that Lunghamer left Zurich to follow Hill to Oakland. Because the non-solicitation period only prevented Hill from soliciting Lunghamer for the 2019 policy period, Hill could have solicited Lunghamer's business for the 2020 period and after. Thus, Zurich's request for two additional years of net lost profits is not supported by the evidence.

Last, the court rejects Hill's request to limit Zurich's award to nominal damages because it did not deduct overhead expenses in its net lost profits calculation. Generally, under Illinois law, the only type of overhead expense that should be deducted from gross revenue are those that can be avoided by defendant's breach, *see Sterling Freight Lines, Inc.*, 674 N.E.2d at 951; *F. E. Holmes & Son Const. Co.*, 435 N.E.2d at 728, and Hill identified no invariable, non-fixed overhead expense that Zurich avoided by his breach.

## CONCLUSION AND ORDER

For these reasons, judgment is entered in favor of Zurich and against Hill in the amount of $194,700.88.

Date: April 23, 2021

_____
U.S. District Judge Joan H. Lefkow

8